IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2017 Term

_____

No. 15-1220

_____

FILED

**April 20, 2017**
**released at 3:00 p.m.**
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Respondent

v.

QUINTON PETERSON,
Petitioner

_____

Appeal from the Circuit Court of Cabell County
The Honorable Alfred E. Ferguson, Judge
Criminal Case No. 08-F-113

AFFIRMED

_____

Submitted: April 4, 2017
Filed: April 20, 2017

Connor D. Robertson, Esq.                    Patrick Morrisey, Esq.
Weston Law Office                            Attorney General
Todd Meadows, Esq.                           Elbert Lin, Esq.
Meadows Law Office                           Solicitor General
Huntington, West Virginia                    Julie A. Warren, Esq.
Counsel for the Petitioner                   Assistant Attorney General
                                             Charleston, West Virginia
                                             Counsel for the Respondent
Valena Beety, Esq.
Melissa Giggenbach, Esq.
Eric Haught, Rule 10 Student Attorney
Morgantown, West Virginia
Counsel for Amici Curiae
The West Virginia Innocence Project

JUSTICE KETCHUM delivered the Opinion of the Court.
JUSTICE DAVIS dissents and reserves the right to file a dissenting Opinion.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review.  We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a de novo review." Syllabus Point 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

2.      "There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, *i.e.*, it must have prejudiced the defense at trial." Syllabus Point 2, *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007).

Justice Ketchum:

Petitioner Quinton Peterson ("Defendant Peterson") appeals the circuit court's November 20, 2015, amended order denying his motion for a new trial. Defendant Peterson was convicted of first-degree murder following a 2008 jury trial and was sentenced to an incarceration term of life without mercy.[1]

After the circuit court entered its amended order denying his motion for a new trial, Defendant Peterson filed the present appeal, raising numerous assignments of

---

[1] Defendant Peterson was convicted in August 2008. On October 30, 2008, the circuit court appointed Defendant Peterson an appellate lawyer, Luke Styer. Mr. Styer failed to file an appeal during the five and a half years that he represented Defendant Peterson. As the circuit court noted in its April 29, 2014, order:

> Luke Styer, Esq., was appointed to assist Defendant in appealing his conviction for this matter on October 30, 2008. To date, and following numerous resentencing orders, Defendant's appellate counsel has yet to file an appeal. In the interest of justice, this Court does relieve Luke Styer as counsel of record[.]

Similarly, in its amended order denying Defendant Peterson's motion for a new trial the circuit court notes, "the Court finds that previous counsel [Luke Styer] for the Defendant failed to pursue an appeal[.]" We are deeply troubled by Mr. Styer's failure to "pursue an appeal" on behalf of Defendant Peterson. We hereby refer this matter to the Lawyer Disciplinary Board to investigate why Mr. Styer failed to file an appeal during the five and half years that he represented Defendant Peterson. We note that Rule 1.3 of the Rules of Professional Conduct provides "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Rule 3.2 of the Rules of Professional Conduct states "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client." *See Lawyer Disciplinary Bd. v. Scott*, 213 W.Va. 209, 579 S.E.2d 550 (2003) (Lawyer failed to file criminal appeal on behalf of his client).

1

error including: (1) the circuit court erred in denying the defendant's motion for a new trial based on the State's failure to turn over exculpatory *Brady*[2] evidence; (2) the State introduced inadmissible hearsay evidence during the trial; and (3) the prosecutor made a number of improper statements during closing argument.

After thorough review, we affirm the circuit court's order denying Defendant Peterson's motion for a new trial.

# I.
## FACTUAL AND PROCEDURAL BACKGROUND

On November 11, 2007, twenty-eight-year old Phillip "Slim" Simmons (hereinafter "victim") was murdered in Huntington, West Virginia. Following an investigation, Defendant Peterson, a twenty-five-year old Columbus, Ohio, resident, was indicted on one count of first-degree murder.

Before discussing the trial in detail, we note the State's theory at trial was that Defendant Peterson murdered the victim after losing approximately $500 to him over the course of two dice games. The first dice game occurred three days before the murder at the home of Erin Stolze. The second dice game occurred on the night of the murder. Defendant Peterson admitted that he and the victim were both dealing drugs and playing dice together on the night of the murder in the outdoor area where the victim's body was

---

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

found. With this general background in mind, we proceed to examine Defendant Peterson's trial.

The State's first witness at trial was Antonio Smith. Mr. Smith testified that he played dice with Defendant Peterson and the victim at Erin Stolze's house three nights before the murder occurred. Mr. Smith testified that Defendant Peterson lost four or five hundred dollars during this dice game. Mr. Smith stated that the victim was "boisterous" and "bragging" after winning the dice game. Defendant Peterson was upset, according to Mr. Smith, and had a verbal confrontation with the victim. Mr. Smith testified that as Defendant Peterson left the residence, he said, "Damn, I wish I had my gun." Also, Mr. Smith testified that on the day before the murder, the victim told him that he and Defendant Peterson were going to have a dice rematch the next day.

The State also called Donovan Wade to testify. Mr. Wade testified that he had previously dealt drugs with the victim and that he routinely bought drugs from the victim. According to Mr. Wade, he was planning to purchase drugs on the night of the murder, and came upon the victim and Defendant Peterson in an alley between two buildings in the Doulton Avenue area of Huntington.[3] Mr. Wade stated that the two men were rolling dice in an alley and testified that the victim and Defendant Peterson were the only people he saw in the alley. Mr. Wade testified that the victim was winning the dice

---

[3] The general area Mr. Wade described is located on or around Doulton Avenue, Seventeenth Street and Eleventh Avenue in Huntington, West Virginia.

3

game and that Defendant Peterson was losing. Mr. Wade explained that he could tell Defendant Peterson was losing the dice game because "[t]he person was losing is to keep putting money down and the person that wins is picking up the money."

Mr. Wade testified that over the course of "forty-five minutes to an hour" he made three trips to and from the alley where Defendant Peterson and the victim were playing dice and selling drugs. Mr. Wade explained that he made two drug purchases from the victim and one from Defendant Peterson during this time. Mr. Wade stated that he remained in the general Doulton Avenue area after making his third drug purchase. At some point after making his third drug purchase, Mr. Wade observed Defendant Peterson approaching the alley where he and the victim had been playing dice. Mr. Wade testified that Defendant Peterson had two guns "in his side or his pockets." He stated that one gun was black and the other was chrome. Shortly after observing Defendant Peterson returning to the alley where the victim was, Mr. Wade stated that he "heard one gunshot. I took off walking because I figured the police was going to end up coming. . . . So I started walking down Seventeenth [Street] towards Tenth Avenue. And I was walking slow and looking back, and I seen him [Defendant Peterson] going across the alley. . . . He ran right back across the way he came from."[4]

_____

[4] Mr. Wade testified that he gave a statement to the police regarding what he observed on the night of the murder a couple of weeks after the murder occurred. Mr. Wade was picked up by the police for active warrants and he provided the police with the

(continued . . .)

4

Dr. James Kaplan was called by the State and testified that the victim "suffered a fatal gunshot wound to his left armpit. That bullet passed through both lungs and his heart and caused fatal bleeding, which caused his death." Dr. Kaplan testified that the estimated time of injury was 7:30 p.m. and the estimated time of death was 7:40 p.m.

On the night of the murder, a motorist driving down the alley near the Doulton Avenue area noticed someone lying in the alley and called the police. Huntington Police Officer Eric Corder received a call at 8:02 or 8:03 p.m. and proceeded to the area. Upon arriving in the area, Officer Corder found the victim's body lying face up, with his pants pulled down around the knee area.[5] Corporal Stephen Compton, a Huntington Police Officer serving in the forensic unit, arrived at the crime scene at approximately 8:30 p.m. He testified that he found dice in the crime scene area and one nine millimeter shell casing.

The State called Julie Eplion, a twenty-year-old woman who had dated Defendant Peterson "on and off." Ms. Eplion testified that on the night of the murder,

_____

statement regarding the murder at that time. During cross-examination, Mr. Wade stated that his warrants were dismissed after he gave his statement to the police.

[5] Mr. Wade testified that the victim, who sold crack cocaine, kept the drugs hidden in his buttocks. The State theorized that after shooting the victim, Defendant Peterson pulled down the victim's pants and robbed him of the drugs that were hidden in his buttocks.

Defendant Peterson called her thirteen times between 7:58 p.m. and 8:16 p.m. Ms. Eplion did not answer her phone because she was "hanging out with friends." Defendant Peterson continued calling until Ms. Eplion answered her phone at 9:06 p.m. In all, Defendant Peterson called Ms. Eplion twenty-five times between 7:58 p.m. and 9:06 p.m. Ms. Eplion stated that Defendant Peterson wanted her to pick him up at a bowling alley and take him to his Cousin Brandon Peterson's house, which was located on Doulton Avenue. Upon arriving at the bowling alley, Ms. Eplion testified that Defendant Peterson was in his Cousin Brandon's car. He exited that car and got into Ms. Eplion's car. Defendant Peterson told Ms. Eplion that he did not want to go to his cousin's house on Doulton Avenue. Ms. Eplion stated that she told Defendant Peterson that there were a "bunch of cops" around Doulton Avenue. She further testified, "whenever I had told him that there were cops over there and he was, like, 'I know there's cops over there. Somebody has gotten shot over there.'" Ms. Eplion testified that because Defendant Peterson was acting nervous in the car she asked him what was wrong and "[h]e said he couldn't – didn't want to tell me because he didn't want me to judge him."

While in the car, Defendant Peterson made a number of phone calls to a woman in Columbus, Ohio.[6] Ms. Eplion stated that Defendant Peterson was giving the Columbus driver directions to Huntington. The Columbus driver met Ms. Eplion and

---

[6] Defendant Peterson testified that this Columbus woman was his girlfriend.

Defendant Peterson in a McDonald's parking lot in Huntington at approximately 11:30 p.m. that evening. Defendant Peterson exited Ms. Eplion's car and got into the Columbus driver's car. It was undisputed during the trial that the Columbus driver picked Defendant Peterson up on the night of the murder and immediately drove him to Columbus.

The State called U.S. Marshal Craig Martin who testified that he apprehended Defendant Peterson on December 3, 2007, in Columbus, Ohio. Marshal Martin went to Defendant Peterson's workplace in Columbus.[7] Upon identifying himself as a law enforcement officer, Marshal Martin testified that Defendant Peterson ran from the building and was apprehended in the parking lot of the business.

The State also called Huntington Police Officer Rocky Johnson who testified that he went to Defendant Peterson's house in Columbus and seized various clothing and footwear from this residence. The State next called Kevin McDowell, an employee of the West Virginia State Police Crime Laboratory. Mr. McDowell testified that one of the pairs of shoes seized from Defendant Peterson's residence "could have made the impression" of a shoeprint that was found at the murder scene. Mr. McDowell

---

[7] Defendant Peterson began working at a business called "House Doctors" in Columbus, Ohio, around November 19, 2008. Defendant Peterson was not employed by House Doctors during his time in Huntington when the shooting occurred.

7

was unable to say, however, that the shoe recovered from Defendant Peterson's Columbus residence was the exact shoe that left the impression at the crime scene.

The defense called two witnesses: Defendant Peterson and his cousin, Brandon Peterson. Brandon Peterson testified that he went bowling with Defendant Peterson on the night of the murder. He testified that they left his residence, located on Doulton Avenue, to go to the bowling alley "between 7:30 p.m. and 8:00 p.m."

Defendant Peterson testified next. He confirmed that he and the victim had been involved in two dice games together. Regarding the first dice game, Defendant Peterson agreed that he and the victim and Antonio Smith had played dice at Erin Stolze's house three nights before the murder. He disputed Mr. Smith's testimony that he lost four to five hundred dollars. Instead, Defendant Peterson testified that he won a couple of dollars during this game, that he did not have a verbal altercation with the victim, and that he did not make the comment, "Damn, I wish I had my gun," following the dice game.

Defendant Peterson admitted that he and the victim played dice again on the night of the murder. The dice game began with just the two of them, according to Defendant Peterson, "as time went on people were walking by and coming and, you know, there was a lot of activity going on . . . because it's a lot of activity in that alley as far as drug activity and things like that." Defendant Peterson's lawyer then asked what kind of drug activity was going on in the alley and Defendant Peterson replied, "I mean, I was selling drugs. . . . I was selling marijuana and I was selling crack. . . . [The victim

8

was] doing the same thing." Defendant Peterson confirmed that State witness Donovan Wade was in the alley on the evening of the murder buying drugs.

Defendant Peterson further testified during his direct examination that at the time of the murder he was on parole following a number of criminal convictions in Ohio. Defendant Peterson explained his previous criminal convictions as follows:

> I had been convicted of a misdemeanor – of a drug charge and in Columbus – in Ohio if you be convicted of a drug charge, I guess they can charge you – I guess it's a felony to have a gun or something like that. . . . I just know I have been convicted for weapons.

> The first time I went to jail it was for weapons under disability and tampering with evidence. The second time I went to jail was for a parole – the parole violation for that and carrying a concealed weapon. . . .

> And then the next time I got arrested it was off – I was on probation for those charges and then I violated the probation and I had caught another gun charge. It was a gun in a car me and my cousin was in and it was by his – my other cousin. This is in Columbus anyways, and it was – it was close to me. They charged me with it.

Defendant Peterson testified that the reason he fled Huntington on the night of the murder was because he was on parole in Ohio and was not allowed to be in West Virginia. He testified that he first heard about the shooting while he was at the bowling alley. Upon hearing that the victim had been shot, Defendant Peterson stated:

> Then my criminal wheel starts spinning, like, 'Hold up. I cannot have -.'

> Like, on parole – on parole I have – this instruction I have is, like, fifteen or twenty rules you have to go back. And like I said you have to notify your P.O. if you are going to

9

leave town. You have to random – I mean random drug tests. You have to report on a week – or a scheduled date. A whole list of rules. And also you cannot have any police interaction, anything like that. So, I was just thinking, like, 'Hold on. They might try and talk to me or something.' You know what I'm saying? I can't be down here. So, let me – you know what I'm saying?

But I – it was all – I wasn't trying – they trying to make it seem like I left because I shot 'Slim' [the victim]. I was already about – I was already planning to leave. I was already planning to leave. My girl was already going to be coming.

Defendant Peterson denied shooting the victim, testified that he was not losing money in the dice game on the night of the murder, and stated that he did not have a gun. When asked why he ran from the U.S. Marshal at his Columbus workplace, Defendant Peterson testified "I don't know. You know? I don't even know why I ran."

During cross-examination, Defendant Peterson admitted that he had been convicted of seven felonies and that three of those crimes involved weapons. Following Defendant Peterson's testimony, the defense rested.

The jury found Defendant Peterson guilty of first-degree murder and did not recommend mercy. By order entered on August 1, 2008, the circuit court sentenced Defendant Peterson to an incarceration term of life without mercy.

On December 12, 2012, the circuit court held a hearing on a motion for a new trial filed by Defendant Peterson. This motion was based on "newly discovered evidence" which the defense asserted was the State's failure to disclose a statement Erin

10

Stolze made to the police on the day before the trial began. Erin Stolze owned the house where the first dice game, that took place three days before the murder, occurred.

By way of background, on the morning Defendant Peterson's trial began, the following exchange was held between Defendant Peterson's lawyer and the prosecutor:

> Defense Counsel: I wanted to say that this was an open-file case, an open-file agreement with the State and that the State has done an exemplary job as far as I can tell of providing us all the information. We have had three official discovery conferences, and we had last night what I call an unofficial one where they provided me more information, including an updated criminal history of their witnesses and a light criminal history of the defendant.
>
> I needed to – we haven't asked about this. But the State has ongoing duties under *Youngblood* and I wanted to see if we couldn't get something here out of [the prosecutor] about *Youngblood*.
>
> Prosecutor: No, I disclosed things yesterday regarding the new information from Antonio Smith and things going on at Erin's –
>
> Defense Counsel: And she is not being called as a witness?
>
> Prosecutor: That's right.
>
> Defense Counsel: We do know where she is. She was disclosed to us and we agree that there is nothing there. I thought we needed to clean that up. There is no exculpatory evidence that you know of?
>
> Prosecutor: No.
>
> Defense Counsel: And you have sought that out?
>
> Prosecutor: Oh, yes.

11

At the hearing on the motion for a new trial, the defense called Erin Stolze to testify. Ms. Stolze testified that Huntington Police Detective Cass McMillian interviewed her the day before Defendant Peterson's trial began. She testified that she told Detective McMillian that Defendant Peterson, Antonio Smith, and the victim took part in a dice game at her house. Ms. Stolze stated that she told Detective McMillian that Defendant Peterson won one hundred dollars in the dice game. Ms. Stolze testified that she did not witness the whole dice game because she was upstairs giving her children a bath. She said Detective McMillian asked her if there were any guns or if any threats were made during the dice game and she told him she did not see any guns or hear any threats. During cross-examination, the State asked Ms. Stolze about Defendant Peterson's alleged statement following the dice game, "Damn, I wish I had my gun." Ms. Stolze replied, "I mean, if that was said, that was said, but I am just telling you . . . I did not hear it. . . . It doesn't mean that it wasn't said. I didn't hear it."

Detective McMillian also testified at this hearing. He testified that he had interviewed Ms. Stolze before Defendant Peterson's trial. While he could not recall the details of their conversation, Detective McMillian stated:

> I can tell you that if it would have been something different, then it would have been written down and been forwarded through my Prosecution Report to the Prosecuting Attorney's Office. . . .

> [T]he reason we were there [at Ms. Stolze's residence] was based on Antonio Smith's statement. The statement that was obtained that day [from Ms. Stolze], had it been different from what we were told by Antonio Smith, would have been recorded in writing and forwarded to the Prosecutor's Office.

12

The circuit court denied Defendant Peterson's motion for a new trial based on this "newly discovered evidence." The circuit court concluded that "the defense has not put forth persuasive evidence that there was anything [Ms. Stolze] said to the police in her statement that was substantially different than the other testimony at trial or that would have altered the outcome of this case." After the circuit court filed its November 20, 2015, amended order denying the defense's motion for a new trial, Defendant Peterson filed the present appeal.

## II.
## STANDARD OF REVIEW

Defendant Peterson appeals the circuit court's order denying his motion for a new trial. We apply the following standard when reviewing a circuit court's order denying a motion for new trial:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syllabus Point 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000). With these standards in mind, we proceed to discuss the assignments of error raised by Defendant Peterson.

13

## III.
## ANALYSIS

In this appeal, Defendant Peterson asserts the following assignments of error: (1) the circuit court erred in denying the motion for a new trial based on the State's failure to turn over exculpatory *Brady* evidence; (2) the State introduced inadmissible hearsay evidence; (3) the State improperly argued propensity evidence; (4) the State introduced inadmissible 404(a) evidence; (5) the State solicited extremely prejudicial hearsay evidence from Antonio Smith; (6) the prosecutor improperly argued his personal beliefs and vouched for the credibility of the witnesses before the jury; (7) the prosecutor argued false evidence to the jury; and (8) cumulative error.

### A. Exculpatory *Brady* Evidence

Defendant Peterson first argues that the State's failure to disclose Ms. Stolze's statement was a constitutional due process violation under *Brady*. Defendant Peterson asserts that Ms. Stolze's statement contradicted the testimony of Antonio Smith regarding whether Defendant Peterson (1) lost money in the first dice game, (2) had a verbal confrontation with the victim, and (3) stated, "Damn, I wish I had my gun," as he left the residence. Defendant Peterson argues that the State used Mr. Smith's testimony to establish motive and premeditation and that Ms. Stolze's testimony could have been used to impeach Mr. Smith's testimony.

The United States Supreme Court has held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the

14

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In addressing the guidelines set forth in *Brady*, this Court held the following in Syllabus Point 2 of *State v. Youngblood*, 221 W.Va. 20, 650 S.E.2d 119 (2007):

> There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, *i.e.*, it must have prejudiced the defense at trial.

Our analysis of this issue requires us to apply each of the elements of Syllabus Point 2 of *Youngblood* to the facts of this case. The first *Youngblood* element is whether Ms. Stolze's statement provided favorable exculpatory or impeachment evidence for Defendant Peterson. We believe it does.

Ms. Stolze's statement could be favorable to Defendant Peterson as impeachment evidence. Her statement contradicted the testimony of State witness Antonio Smith. Mr. Smith testified that Defendant Peterson lost four to five hundred dollars to the victim, had a verbal altercation with the victim, and made a threatening statement as he left the residence. By contrast, Defendant Peterson testified that he won money in the first dice game, that he did not have a verbal confrontation with the victim, and did not make the threatening comment as he left the residence. Ms. Stolze's statement supports Defendant Peterson's testimony and tends to impeach Mr. Smith's

15

version of events during the first dice game.  For these reasons, we find the first element of *Youngblood* is satisfied.

The second *Youngblood* element requires us to determine whether the evidence was willfully or inadvertently suppressed by the State.  This Court discussed this element in detail in *Youngblood*, stating:

> [E]vidence is considered suppressed when "the existence of the evidence was known, or reasonably should have been known, to the government, the evidence was not otherwise available to the defendant through the exercise of reasonable diligence, and the government either willfully or inadvertently withheld the evidence until it was too late for the defense to make use of it."

*Id.* at 31, n.21, 650 S.E.2d at 130, n.21, (*quoting United States v. Knight*, 342 F.3d 697, 705 (7th Cir.2003)).

Thus, to prevail on the second *Youngblood* element, Defendant Peterson is required to demonstrate that (1) the State knew or should have known about Ms. Stolze's statement, (2) Ms. Stolze's statement was not available to Defendant Peterson through the exercise of reasonable diligence, and (3) the State willfully or inadvertently withheld Ms. Stolze's statement.

It is undisputed that the State knew that the police had taken a statement from Ms. Stolze on the day before the trial.  Thus, Defendant Peterson satisfies the first element of the three-part test.  However, Defendant Peterson has failed to satisfy the second element of this test.  Defendant Peterson's trial lawyer stated on the morning the trial began that Ms. Stolze had previously been disclosed to the defense and that "we do

16

know where she is. She was disclosed to us and we agree that there is nothing there." The State disclosed Ms. Stolze to the defense. Ms. Stolze lived in Huntington at the time of the trial and the defense knew where she was. Thus, it is clear that the defense could have interviewed Ms. Stolze and obtained her statement about what occurred during the first dice game through the exercise of "reasonable diligence." Therefore, we find that Defendant Peterson has not satisfied the second element of the three-part test under our second *Youngblood* inquiry.

Assuming *arguendo* that Defendant Peterson could satisfy the second *Youngblood* element, we find that his argument would nevertheless fail under the third *Youngblood* element. Under the third *Youngblood* element, Defendant Peterson must show that Ms. Stolze's statement was material.

This Court has recognized that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Fortner*, 182 W.Va. 345, 353, 387 S.E.2d 812, 820 (1989) (*quoting United States v. Bagley*, 473 U.S. 667, 682 (1985)). Additionally, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). All that is required is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435.

17

Finally, the suppressed evidence "must be evaluated in the context of the entire record." *U.S. v. Agurs*, 427 U.S. 97, 112 (1976).

Viewing Ms. Stolze's statement in the context of the entire record, her testimony does not create a reasonable probability that the result of the trial would have been different had she testified. Ms. Stolze's statement was confined to events that occurred three days before the murder.[8] The key evidence presented by the State during the trial was testimony from multiple witnesses about what occurred on the night of the murder. Mr. Wade testified that he saw the victim and Defendant Peterson dealing drugs and playing dice together on the night of the murder in the area where the victim's body was later found. Defendant Peterson did not dispute that he was dealing drugs and playing dice with the victim on the night of the murder in the area where the body was later found. Further, Mr. Wade testified that on the night of the murder, he saw Defendant Peterson with two guns, proceeding toward the area where the victim was selling drugs. Finally, Mr. Wade testified that shortly after seeing Defendant Peterson heading in the direction of the victim, he heard a gunshot, and a minute or two later, saw Defendant Peterson jogging away from the area.

Dr. Kaplan testified that the estimated time of death was 7:40 p.m. Julie Eplion testified that Defendant Peterson called her twenty-five times between 7:58 p.m.

---

[8] The purpose of this evidence was limited solely to motive, which is not an element of the crime charged.

18

and 9:06 p.m. on the night of the murder. After picking Defendant Peterson up that evening, Ms. Eplion testified that Defendant Peterson was acting nervous and was repeatedly placing phone calls to a woman in Columbus requesting that she drive to Huntington to pick him up. Ms. Eplion testified that the Columbus driver picked Defendant Peterson up at 11:30 p.m. on the night of the murder.

Defendant Peterson did not dispute that he was with the victim on the night of the murder selling drugs and playing dice. Defendant Peterson did not dispute that he made repeated phone calls to Ms. Eplion, nor did he dispute that he had a Columbus woman pick him up at 11:30 p.m. on the night of the murder and immediately drive him to Columbus. Finally, Defendant Peterson did not dispute that he fled when the U.S. Marshal attempted to apprehend him in Columbus. Defendant Peterson did not offer any reason explaining why he attempted to run away from the Marshal.

Based on this substantial evidence regarding the events that occurred on the night of the murder and of Defendant Peterson's behavior and actions thereafter, we cannot find that Ms. Stolze's testimony about the dice game that occurred three days before the murder would reasonably have put the result of the case in a different light sufficient to undermine confidence in the jury's verdict. Ms. Stolze's statement simply had little to no bearing on any of the testimony regarding what occurred on the night of the murder or on Defendant Peterson's subsequent behavior and actions. We therefore find that Defendant Peterson's first assignment of error fails.

19

## B. Introduction of Inadmissible Hearsay by the State

Before addressing the next alleged error, we note that all of the remaining assignments of error raised by Defendant Peterson were not objected to by defense counsel during the trial.[9]

First, Defendant Peterson alleges that the State introduced inadmissible hearsay evidence during its cross-examination of the defendant. By way of background, the alleged hearsay evidence involved a discussion about a pair of boots recovered from Defendant Peterson's Columbus residence. He lived at this residence with his mother and his younger brother. Huntington Police Officer Rocky Johnson was called by the State and testified that the Columbus residence had two upstairs bedrooms, one of which was Defendant Peterson's and one which Defendant Peterson and his younger brother

---

[9] Defendant Peterson's brief repeatedly questions the performance of his trial counsel. For instance, his brief provides "the [defendant] should not be forced into Harmless or Plain Error analysis . . . for his counsel's failure to make a simple and necessary objection." Further, the brief provides that Defendant Peterson "had to object and fight for himself for the majority of the trial as clearly trial counsel did not know the case." While not specifically raised in this appeal, our cases have made clear that a "claim of ineffective assistance of counsel is generally not ripe for direct appellate review." *State v. Hutchinson*, 215 W.Va. 313, 323 599 S.E.2d 736, 746 (2004). *See also* Syllabus Point 10, *State v. Triplett*, 187 W.Va. 760, 421 S.E.2d 511 (1992) ("It is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.").

shared.  When asked how he obtained the information about the bedrooms, Officer Johnson testified, "[t]hrough his mother and there was some mail and some various things in that room that had [Defendant Peterson's] name on it."  Officer Johnson further testified that the clothing they seized came from the bedroom that was only used by Defendant Peterson and that the boots were seized from the bedroom that was shared by Defendant Peterson and his younger brother.  During his direct examination, Defendant Peterson testified that the boots that were seized from the Columbus residence were not his: "Those are not my boots.  I don't know whose boots they are.  My little brother wears them.  That's what my mom says."

With this background in mind, we turn to the complained of exchange between the prosecutor and Defendant Peterson, in which Defendant Peterson asserts that the State introduced inadmissible hearsay evidence.  The exchange is as follows:

> Prosecutor:  Would it surprise you if your mother told the police that the light brown boots were yours when they executed the search?
>
> Defendant:  No, because my mom maybe – maybe not had known that those in the room were his or mine or just there.
>
> Prosecutor:  I believe the testimony was that they asked your mom whose boots were these and she said yours; that these were your little brother's; and that these [light brown boots] were yours; right?
>
> Defendant:  I didn't get that part where they asked her specifically whose shoes were who.
>
> Prosecutor:  You didn't hear Detective Johnson say that?

Defendant:   No, I heard him say that he – that the boots were mine because they were got out of my room.

Prosecutor:   No, sir.  He said the clothes came out of your room and that both boots came out of the other bedroom and that your mother said the light brown boots were yours.  Does that refresh your memory of what was testified to yesterday, sir?

Defendant:   If I could look at my notes because I am pretty sure I wrote that down.

A review of the trial transcript supports Defendant Peterson's assertion that there was no testimony supporting the premise of the prosecutor's question—"I believe the testimony was that they asked your mom whose boots were these and she said yours . . . right?"  While Officer Johnson testified that Defendant Peterson's mother provided information about which bedroom was his, there was no testimony that the defendant's mother stated that the light brown boots belonged to Defendant Peterson.

This Court addressed a similar issue in *State v. Guthrie*, 194 W.Va. 657, 685, 461 S.E.2d 163, 191 (1995), in which the prosecutor asked the defendant about an alleged statement he had made to a police officer and defense counsel objected because the alleged statement was not disclosed during discovery.  This Court noted that the prosecutor offered no factual basis for this question during the trial and observed that "[t]rial courts should preclude questions for which the questioner cannot show a factual and good faith basis." *Id.* at 686, fn. 42, 461 S.E.2d 192, fn. 42.

The present case is distinguishable from *Guthrie*, however, because Defendant Peterson's trial counsel did not object to the prosecutor's questions about the

22

alleged statement Defendant Peterson's mother had made. In *State v. LaRock*, 196 W.Va. 294, 316, 470 S.E.2d 613, 635 (1996), Justice Cleckley described the "raise or waive" rule:

> One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result in the imposition of a procedural bar to an appeal of that issue. Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights. Recently, we stated in *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996): "The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

(Internal citation and quotation omitted).

However, the raise or waive rule is not absolute. In *State v. Miller*, 194 W.Va. 3, 18, 459 S.E.2d 114, 129 (1995), we stated: "The 'plain error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no

23

objection has been made." This Court has held: "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syllabus Point 7, *State v. Miller*, *supra.*

If these criteria are met this Court may correct the plain error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160 (1936). As Justice Cleckley noted in *LaRock*,

> an unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that "seriously affect the fairness, integrity or public reputation of the judicial proceedings." *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985).

*Id*. at 317, 470 S.E.2d at 636.

After review, we find that the prosecutor's question was improper because there was no factual basis demonstrating that the defendant's mother stated that the particular pair of boots belonged to Defendant Peterson. However, we find that this brief line of questioning did not skew "the fundamental fairness or basic integrity of the proceedings in some major respect." *Id*. Further, we find that this brief line of questioning did not constitute a "miscarriage of justice." Defendant Peterson disagreed with the prosecutor about whether his mother had made the statement that the boots were

24

his.  In fact, during his direct examination, Defendant Peterson testified that his mother had stated the boots belonged to his younger brother.  Defendant Peterson also testified that his shoe size was nine or nine and a half, and pointed out that the boots in question were size eight.  The jury, having heard Officer Johnson's testimony, as well as Defendant Peterson's testimony, could have resolved this factual dispute in Defendant Peterson's favor.  Further, the evidence regarding the pair of boots was not so crucial that it affected the fairness or integrity of the judicial proceeding.[10]

As discussed in section III. A., the evidence the State presented against Defendant Peterson through the testimony of Mr. Wade, Ms. Eplion, and even the defendant himself, was substantial.  This evidence established that (1) Defendant Peterson was with the victim on the night of the murder in the area where the body was found; (2) an eyewitness saw Defendant Peterson, armed with two guns, entering the alley where the victim was selling drugs, heard a single gunshot shortly thereafter, and then saw Defendant Peterson jogging away from the area; (3) Defendant Peterson made twenty-five phone calls to a Huntington acquaintance in the hour after the murder occurred; (4) Defendant Peterson called his Columbus girlfriend approximately ninety minutes after the murder occurred, requesting that she drive to Huntington to pick him

---

[10] We note that State witness Kevin McDowell, an employee of the West Virginia State Police Crime Laboratory, was unable to testify definitively that the pair of boots recovered from the Columbus house made the footprint impression that was recovered from the crime scene.

up; (5) Defendant Peterson left Huntington and returned to Columbus on the night of the murder at 11:30 p.m.; and (6) Defendant Peterson fled when a U.S. Marshal attempted to apprehend him in Columbus and offered no reason explaining why he fled upon seeing the Marshal.

By contrast to this substantial evidence the State presented regarding the events that occurred on the night of the murder and of Defendant Peterson's behavior and actions after the murder, the evidence the State presented about the boots was relatively minor. Further, the jury heard Defendant Peterson's testimony that the boots did not belong to him, and heard Officer Johnson's testimony regarding his search of the Columbus residence.

Based on the foregoing, we conclude that the prosecutor's brief line of questioning about the boots did not affect "the fundamental fairness or basic integrity of the proceedings in some major respect." *LaRock*, 196 W.Va. at 317, 470 S.E.2d at 636. We therefore conclude that Defendant Peterson's second assignment of error fails.

### C. Bad Character Evidence/Improper Comments During Closing Argument

Defendant Peterson next argues that the State introduced bad character evidence in violation of Rule 404(a) of the West Virginia Rules of Evidence.[11]

---

[11] Rule 404(a) provides:

(continued . . .)

26

Defendant Peterson concedes that "defense counsel solicited evidence of [Defendant Peterson's] bad character and criminal history on direct examination." Defendant Peterson admits that this line of questioning "opened the door for the prosecutor" to question Defendant Peterson about his bad character and criminal history. However, Defendant Peterson argues that the prosecutor improperly argued this bad character evidence to the jury during his closing statement.

The State asserts that Defendant Peterson did not object to any of the prosecutor's statements made during closing argument, therefore, this issue was waived. Further, the State notes that Defendant Peterson put his criminal history into evidence as part of his defense strategy and the prosecutor had the right to cross-examine him on this issue and to argue the facts raised by Defendant Peterson, including his criminal history, to the jury.

After review, we find that the issue of Defendant Peterson's criminal past was raised and extensively discussed during Defendant Peterson's direct examination. Defendant Peterson readily admitted that he had a number of previous felonies involving

---

(1) Prohibited Uses. Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.
(2) Exceptions for a Defendant or Victim in a Criminal Case. The following exceptions apply in a criminal case:
(A) a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it[.]

27

weapons charges,[12] that he was on parole from Ohio, and that he had been dealing drugs in Huntington. Defendant Peterson explained that the reason he fled Huntington on the night of the murder was because he was not allowed to be in West Virginia under the terms of his Ohio parole, and he feared any contact with a West Virginia policeman would lead to his parole being revoked. Because Defendant Peterson affirmatively placed his criminal past into the trial, we find no error with the prosecutor's statements discussing Defendant Peterson's criminal history during his closing argument.

Furthermore, in Syllabus Point 5 of *State v. Grubbs*, 178 W.Va. 811, 364 S.E.2d 824 (1987), this Court held, in relevant part, "[i]f either the prosecutor or defense counsel believes the other has made improper remarks to the jury, a timely objection should be made coupled with a request to the court to instruct the jury to disregard the remarks." This Court has also long held that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a

---

[12] Defendant Peterson introduced evidence regarding his previous felonies involving weapons charges. Defendant Peterson's trial lawyer asked Julie Eplion if she saw Defendant Peterson with a gun on the night of the murder, to which she answered no. In response to this line of questioning, the State asked Ms. Eplion if she had ever seen Defendant Peterson with a gun, to which she answered yes. Defendant Peterson argues that the State's question was improper and should have been barred under Rule 404(a). Defendant Peterson's trial lawyer did not object to the State's question. Thus, we find this assignment of error has been waived. *See LaRock*, 196 W.Va. at 316, 470 S.E.2d at 635 ("One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result in the imposition of a procedural bar to an appeal of that issue.").

28

case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syllabus Point 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945). *See State v. Davis*, 205 W.Va. 569, 586, 519 S.E.2d 852, 869 (1999) ("In view of our precedent, the defendant cannot argue for the first time on appeal that the prosecutor made improper remarks during the State's . . . closing argument."); *State v. Young*, 185 W.Va. 327, 349 n. 25, 406 S.E.2d 758, 780 n. 25 (1991) (finding defendant waived issue of improper remarks by the prosecutor during closing argument because of failure to object). Defendant Peterson did not object to the prosecutor's closing argument. Thus, based on our clear law, we deem this issue waived.[13]

---

[13] Two other assignments of error raised by Defendant Peterson concern alleged improper comments made during the prosecutor's closing argument. In his sixth and seventh assignments of error, Defendant Peterson alleges: The prosecutor improperly argued his personal beliefs and vouched for the credibility of the witnesses before the jury; and the prosecutor argued false evidence to the jury. These two assignments of error also fail because no objection was made during closing argument. We note that in *State v. Sugg*, 193 W.Va. 388, 456 S.E.2d 469 (1995), defense counsel objected to certain statements made during the prosecutor's closing statement. Under that circumstance, the Court, in Syllabus Point 6, set forth the following four-factor inquiry:

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

(continued . . .)

## D. Hearsay Evidence

The next assignment of error is Defendant Peterson's contention that the State introduced inadmissible hearsay through the testimony of Antonio Smith. The complained of testimony concerned Mr. Smith's testimony that on the day before the murder, the victim told him that he and Defendant Peterson were going to play dice on the following day. The specific testimony is as follows, "[the victim] told me Sunday they were going to throw dice again. It was rematch day." Defendant Peterson argues that this statement is inadmissible hearsay under Rule 801 of the West Virginia Rules of Evidence.

At the outset, we note that defense counsel did not object to this testimony. This Court has held that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court." Syllabus Point 6, *Yuncke*, *supra*.

Further, we observe that

> [g]enerally, out-of-court statements made by someone other than the declarant while testifying are not admissible unless: 1) the statement is not being offered for the truth of the matter asserted, but for some other purpose such as motive, intent,

---

This four-factor test is not applicable to the present case because no objection was raised during the prosecutor's closing argument. *See State v. Grubbs*, *supra*; *Yuncke v. Welker*, *supra*; and *State v. Young*, *supra*.

30

state-of-mind, identification or reasonableness of the party's action; 2) the statement is not hearsay under the rules; or 3) the statement is hearsay but falls within an exception provided for in the rules.

Syllabus Point 1, *State v. Maynard*, 183 W.Va. 1, 393 S.E.2d 221 (1990). "The underlying rationale of the hearsay rule is to prevent the admission into evidence of unreliable or untrustworthy evidence." *State v. Boyd*, 167 W.Va. 385, 397, 280 S.E.2d 669, 679 (1981).

In the present case, the complained of testimony was neither unreliable nor untrustworthy. The substance of Mr. Smith's complained of testimony was that Defendant Peterson and the victim were going to play dice together on the night of the murder. Defendant Peterson argues that this testimony was hearsay. It is undisputed that Defendant Peterson and the victim played dice together on the night of the murder. Defendant Peterson admitted this fact during his testimony. Similarly, Mr. Wade testified that he observed the victim and Defendant Peterson playing dice together on the night of the murder.

Based on the foregoing, we find no error.

### E. Cumulative Error

Defendant Peterson's final assignment of error is a one-paragraph argument that "[t]he cumulative nature of the above-captioned violations deprived [Defendant Peterson] of the right to a fair trial."

31

Our standard for reviewing a cumulative error argument was set forth in Syllabus Point 5 of *State v. Smith*, 156 W.Va. 385, 193 S.E.2d 550 (1972): "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Further, this Court has recognized that the cumulative error doctrine "should be used sparingly" and only where the errors are apparent from the record. *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 118, 459 S.E.2d 374, 395 (1995).

After review we find no merit in Defendant Peterson's cumulative error argument. The majority of the alleged errors in this matter were not objected to during the trial. As Justice Workman noted in a concurring opinion in *Finley v. Norfolk and Western Ry. Co.*, 208 W.Va. 276, 283, 540 S.E.2d 144, 151 (1999), "unobjected to errors are not properly the subject of the cumulative error doctrine." Because six of the alleged errors now claimed to constitute cumulative error were unobjected to below, this Court cannot conclude that this case should be reversed based upon cumulative error.

Additionally, we find that the alleged errors in this case are not so substantial as to have denied Defendant Peterson a fair trial. It has been observed that "[i]f the errors, while numerous, are insignificant or inconsequential, the case should not be reversed under the doctrine." 1 Louis J. Palmer, Jr., Robin Jean Davis and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 103.03[1][e], p. 37 (6th ed.2015).

**IV.**
**CONCLUSION**

In view of the foregoing, the circuit court's November 20, 2015, order denying Defendant Peterson's motion for a new trial is affirmed.

AFFIRMED.