**Ronald W. JOHNSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 83–165.**

District of Columbia Court of Appeals.

Argued Nov. 9, 1983.

Decided Dec. 15, 1983.

Thomas K. Clancy, Washington, D.C., appointed by this court, for appellant.

Sharon M. Collins, Asst. U.S. Atty., Washington, D.C. with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and Kathleen E. Voelker, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before FERREN and PRYOR, Associate Judges, and REILLY, Chief Judge, Retired.

FERREN, Associate Judge:

A jury convicted appellant of armed robbery. D.C.Code §§ 22–2901, –3202 (1981). On appeal, he contends that (1) the trial court abused its discretion in refusing to ask one of defense counsel's proposed questions during the *voir dire* of prospective jurors; (2) the court erred in rejecting appellant's motion to suppress in-court identification testimony; and (3) a remark by one of the jurors during the jury poll indicates the verdict of guilty was not unanimous. We affirm.

I.

On the evening of February 12, 1982, Ralph Breidenthal drove his wife's automobile into a parking lot adjacent to a fast food restaurant and parked the car at the edge of the lot. As Breidenthal began to walk through the lot, two men approached him. When they were "within touching distance" of Breidenthal and face to face with him, one of the men produced a gun and ordered Breidenthal to lie face down beside his wife's car. Breidenthal was pushed to the ground; the man with the gun climbed on his back and put the gun to Breidenthal's ear.

The gunman's accomplice demanded that Breidenthal turn over his car keys and, after Breidenthal complied with this demand, the man with the gun took Breiden-

thal's money and began searching his pockets for valuables. During the course of this search, the man with the gun repeatedly struck Breidenthal in the head with the gun, causing considerable bleeding. When his accomplice was unable to get the car started, the man with the gun allowed Breidenthal to get up from the ground and to assist in starting the car. The two men then ordered Breidenthal to walk to the front of the car while they backed the car out of the parking space and drove off. The total length of the encounter was between five and ten minutes.

Immediately after the robbery, Officer David Lee of the Metropolitan Police Department interviewed Breidenthal, who described the man with the gun as "a black male, 25 years, 5'10", approximately 165 pounds, medium complexion, and having a light brown jacket."

On the day after the robbery, two Montgomery County Police Officers arrested appellant sitting in the driver's seat of Breidenthal's wife's car in Rockville, Maryland. The Metropolitan Police called Breidenthal, told him that his car had been recovered, and asked if police officers could come to his home to show him a set of photographs. When the officers arrived at Breidenthal's home, they spread out eight sets of photographs and asked Breidenthal whether he could identify the persons who robbed him from the photos. Breidenthal picked out a photograph of appellant as the man who had beaten him with a gun and stolen his money and car, stating that he "was 80 to 90 percent certain" and that "when I saw the picture it was immediately clear that it was him."

Four months later, Breidenthal saw appellant in a Montgomery County court proceeding and again identified him as the man who had robbed him at gunpoint. Breidenthal stated that he was even "more certain" of his identification of appellant after seeing him in person.

II.

Appellant's case came to trial on the morning of November 23, 1982, two days

before Thanksgiving. During the course of the *voir dire* of prospective jurors, the court asked an extensive series of questions in an effort to determine whether any member of the venire had general or particular biases that might compromise objectivity toward appellant's case. At the conclusion of this questioning, the court asked whether any member of the panel knew "of any reason whatsoever why he or she cannot sit as a juror in this case and render a fair and impartial verdict based solely on the law and the evidence as you shall hear it?"

At that point, appellant's counsel requested that the court ask the panel members "[w]hether or not there is anything that would prevent them from giving full time and attention to the case," asserting that holiday visiting might preclude some jurors from focusing on the case. The court denied this request, stating that appellant's trial would be completed before Thanksgiving Day and that the last question posed to the panel provided prospective jurors with sufficient opportunity to raise any holiday-related reason for their inability to serve on the jury. The trial judge concluded that the proposed question "would be productive of more mischief than it would solve."

▮ Appellant argues that the trial court committed reversible error by refusing to question the jury regarding their Thanksgiving holiday plans. The decision as to what questions should be asked during the *voir dire* of the jury rests within the sound discretion of the trial judge, subject only to "the essential demands of fairness." *Davis v. United States,* 315 A.2d 157, 160 (D.C.App.1974) (quoting *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931)). The trial court here conducted a careful *voir dire* focusing on whether the prospective jurors were free from bias or prejudice and providing them with an opportunity to make known any reason they might have to be excused. The record demonstrates no ground for concluding that the trial judge transgressed "the

essential demands of fairness" or otherwise erred.

## III.

During the course of appellant's trial, evidence was admitted with respect to three separate identifications of appellant by Breidenthal: (1) Breidenthal testified that he selected appellant's picture from a photo array two days after the robbery; (2) he also testified regarding his in-person identification of appellant four months after the robbery; and (3) Breidenthal identified appellant in court, stating that he recognized appellant as the man who held him at gunpoint during the robbery. Defense counsel argued to the trial court that, because the initial photo array procedure conducted by the police was unduly suggestive, evidence regarding all three of these identifications should be suppressed. According to counsel, the suggestive procedure not only resulted in a possible misidentification by Breidenthal from the photo array but also tainted the subsequent identifications. The trial court found that the photo array presented to Breidenthal two days after the robbery was not suggestive and, accordingly, rejected appellant's objections to the identification testimony.

▮ On appeal, appellant challenges only the admission of Breidenthal's in-court identification of appellant, arguing that the in-court identification was tainted by the earlier photo array identification procedure. In addressing this argument, we must undertake "a two-stage inquiry":

(1) Was the identification procedure "unnecessarily suggestive and conducive to irreparable [mistaken] [ ]identification"? [*Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967) ];

(2) If so, given the "totality of the circumstances," was the resulting identification reliable nonetheless? *Manson v. Brathwaite,* [432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977) ].

*Patterson v. United States,* 384 A.2d 663,

665 (D.C.App.1978).[1] Thus, it was error to admit the in-court identification only if the trial court erred in finding no suggestiveness, and we cannot conclude on this record that the in-court identification had an independent basis of reliability.

■ We find no reason to upset the trial judge's finding that the photo array identification was not suggestive. Although appellant points to the fact that no other photograph in the array depicted a person with facial hair precisely like appellant's, neither Breidenthal's initial description of the gunman nor the reasons he gave for selecting appellant's photograph refer to facial hair. Where "an important identifying characteristic" is not involved, the presence of a distinguishing feature on the selected photograph does not necessarily render a photo array unduly suggestive. *Harris v. United States,* 375 A.2d 505, 509 (D.C.App. 1977). Similarly, a review of the record— including an examination of the photo array used in this case—reveals ample support for the trial court's findings that neither the shading of appellant's photograph nor any statement by the police to Breidenthal compromised the fairness of this procedure.

■ In any event, Breidenthal's in-court identification of appellant satisfies the standards of reliability articulated in *Manson, supra,* 432 U.S. at 114–15, and *Patterson, supra,* 384 A.2d at 666 n. 4. Breidenthal had ample opportunity to view his assailants during the five to ten minute robbery, and he testified that appellant "really had my attention" during this encounter. That Breidenthal accurately remembered his attackers is bolstered by the fact that immediately after the crime he provided the police with a fairly detailed description that matched appellant. Finally, on each of three occasions, Breidenthal identified appellant (or appellant's photo) without hesitation and with a high degree of certainty. A review of the "totality of the circumstances" leaves no doubt that the in-court identification of appellant was reliable.

## IV.

After the jury returned a verdict of guilty, defense counsel requested a poll of the jury. As each of their numbers was called, eleven of the twelve jurors answered, "Guilty." Juror number seven, however, answered, "Guilty, I guess," without further comment. The record indicates that the response by juror number seven elicited no reaction from either counsel or the court. The clerk proceeded with the poll without hesitation, no objection was made, and no questions were asked.

■ Appellant contends that the "Guilty, I guess" response reveals that juror number seven was not convinced of appellant's guilt beyond a reasonable doubt. He claims that the trial court's acceptance of the guilty verdict was plain error in light of this alleged equivocation during the jury poll. If juror number seven's response were read to indicate uncertainty regarding appellant's guilt, appellant is correct in pointing out that this would constitute an infringement of appellant's fundamental right to a unanimous verdict as guaranteed by the Sixth Amendment. *Andres v. United States,* 333 U.S. 740, 748, 68 S.Ct. 880, 884, 92 L.Ed. 1055 (1948); *Matthews v. United States,* 252 A.2d 505, 506–07 (D.C.App.1969). We conclude, however, that the juror's response, in context, does not demonstrate uncertainty about appellant's guilt; consequently, no plain error occurred. *See Watts v. United States,* 362 A.2d 706, 708 (D.C. App.1976) (en banc).

---

1. We reiterate our previous statements encouraging trial courts to conduct both steps of this inquiry in all cases in which this type of issue arises. *Patterson, supra,* 384 A.2d at 668 n. 7. Even when the trial court finds that a pretrial identification procedure was not unduly suggestive and consequently could not taint a subsequent identification, it is helpful to this court for the trial judge to go on to make findings regarding independent sources that support the reliability of the subsequent identification. Because we agree with the trial court's finding on the suggestiveness issue, however, its failure to address the reliability step does not require us to remand this case for further findings.

While appellant bases his argument on the dictionary meaning of the words used by juror number seven to respond to the jury poll, we do not believe that such a mechanical approach is appropriate to this case. "From a reading of the record it is impossible to determine the tone of voice of the jurors when they individually announced their decision, the hesitancy of their responses, and other possibilities that could have taken place and had significant meaning." *Headen v. United States,* 373 A.2d 599, 601 (D.C.App.1977) (quoting *United States v. Smith,* 411 F.2d 733, 736–37 (6th Cir.1969)). Because these unspoken communicative factors play a large role in understanding the proper meaning to be attributed to a juror's response to a jury poll, the trial judge possesses "a measure of discretion" in evaluating such responses, and "the reasonable exercise of this discretion should be accorded proper deference by a reviewing court." *United States v. Brooks,* 137 U.S.App.D.C. 147, 150, 420 F.2d 1350, 1353 (1969).

As in *Jackson v. United States,* 128 U.S. App.D.C. 214, 216, 386 F.2d 641, 643 (1967), the language used by juror number seven "in cold print is susceptible of different interpretations." *Id.* Although the statement "Guilty, I guess" could indicate that the juror was uncertain about the defendant's guilt, it also could mean that the juror was uncertain whether it was his turn to speak, or unclear about the terminology that he should use. Moreover, the words "I guess" are commonly used in conversation as a meaningless addendum to an answer, without intending to communicate uncertainty of any kind.[2]

To determine which of these meanings should be ascribed to juror number seven's response, one must consider the juror's demeanor and the tone and pattern of his speech. The trial court is in a much better position to evaluate these factors than is an appellate tribunal. The trial judge indicated his understanding that the juror's response was unequivocal by permitting the jury poll to continue without interruption and accepting the jury's verdict without question.[3] The silence of appellant's trial counsel, who certainly must have given full attention to the jury poll which he had requested, strongly supports the reasonableness of the trial judge's perception.[4]

*Affirmed.*

---

2. An example provided during oral argument serves to illustrate this common use (or misuse) of the phrase "I guess." When two judges pass in the hall shortly before they are both scheduled to attend an appellate argument, one might well inquire of his colleague, "See you in court?" The answer could reasonably be, "Sure, I guess." This response would not, however, generally be understood to mean that the responding judge is uncertain whether he will be attending the argument.

3. On the facts of this record, we are unwilling to assume that the trial judge simply ignored his responsibility to investigate any equivocation on the part of the juror, as the court did in *Matthews, supra,* 252 A.2d at 506. Instead, we conclude that the trial judge's silence in the face of juror number seven's response reflects a failure to perceive any uncertainty in the juror's verdict.

4. This case is distinguishable from those relied on by appellant where the record clearly showed that one of the jurors harbored uncertainties about the defendant's guilt. *Solar v. United States,* 86 A.2d 538 (D.C.Mun.App.

1952); *Sincox v. United States,* 571 F.2d 876 (5th Cir.1978). The record in *Solar* indicates that the following colloquy occurred during the jury poll:

> One woman juror stated: May I know the reason for this? You see, I'm sorry but what do you mean? Is what I did, the question?
> The Court: Have you not decided whether or not this man is guilty or innocent?
> The Woman Juror: I said not guilty. I said not guilty and I changed it to guilty in a way. Is that what you mean?
> The Court: No; that is not what I mean. You went in the jury room and when you decided this issue, did you decide this man was guilty or not guilty?
> Juror: Guilty, I suppose.

86 A.2d at 539–40. Appellant relies on the similarity between the final response given by the juror in *Solar* and the "Guilty, I guess" response in this case. Unlike the present case, however, the comments of the juror in *Solar,* if read in their entirety, can only be understood to reflect uncertainty about the verdict. The same is true of the juror's comment in *Sincox, supra:* "Yes [Guilty]. With reasonable doubt." 571 F.2d at 877.

On review, this court will not allow a judgment to stand where the trial judge has ignored a clear indication of uncertainty during the jury poll. Where, however, as in the present case, the trial judge reasonably interprets an ambiguous comment by a juror not to compromise the unanimity of the verdict, there are no grounds for reversal.