IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 19-0006

_____

FILED

June 8, 2020

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JEREMY S.,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Calhoun County
The Honorable R. Craig Tatterson, Judge
Case No. 14-F-29

AFFIRMED

_____

Submitted: March 24, 2020
Filed: June 8, 2020

Jeremy B. Cooper, Esq.
Blackwater Law PLLC
Kingwood, West Virginia

Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Lindsay S. See, Esq.
Solicitor General
Caleb A. Ellis, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

CHIEF JUSTICE ARMSTEAD delivered the Opinion of the Court.

**SYLLABUS BY THE COURT**

1.      When a circuit court polls a jury pursuant to Rule 31(d) of the West Virginia Rules of Criminal Procedure, it is within the circuit court's sound discretion to evaluate the jurors' responses and determine whether clarifying questions should be asked of the jurors.

2.      When a circuit court polls a jury pursuant to Rule 31(d) of the West Virginia Rules of Criminal Procedure, and appropriate, neutral questions reveal that a juror is confused about a matter, feels coerced to join the majority's verdict, or is otherwise in need of further instruction, the circuit court may respond in a very limited manner with appropriate, non-coercive, neutral statements that address the concern.

**Armstead, Chief Justice:**

Petitioner, Jeremy S.,[1] was indicted for incest, sexual assault in the third degree, and sexual abuse by a parent, guardian, custodian or person in a position of trust to a child. He was tried twice in the Circuit Court of Calhoun County. The first trial resulted in a hung jury. The second trial resulted in a conviction on nine counts. Petitioner appeals, arguing (a) that the first trial actually resulted in his acquittal, (b) that the first trial was wrongly continued over his objection, (c) that both trials were tainted by irrelevant, non-probative, and prejudicial evidence, (d) that the second trial was tainted by a biased juror, and (e) that two or more of these errors accumulated to his prejudice.

Based on the record before us, the arguments of the parties, and the applicable law, we find no error; therefore, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 13, 2013, Corporal J.B. Hunt of the West Virginia State Police received a Child Protective Services ("**CPS**") referral about Petitioner's fourteen-year-old daughter. Cpl. Hunt and two CPS workers interviewed the daughter, who reported several instances of sexual abuse by Petitioner. The last instance had happened just two days before, and the daughter said that it happened on or under a sleeping bag and a blanket,

---

[1] Due to the sensitive facts of this case, we protect the victim's identity by using an initial for her father's last name. *See* W. Va. R. App. P. 40(e) (2010). *See e.g.*, *In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R.*, 230 W. Va. 731, 742 S.E.2d 419 (2013).

1

both of which she described.[2] Cpl. Hunt obtained a warrant that same day and searched Petitioner's house. He recovered a sleeping bag and a blanket and later delivered them to the West Virginia State Police Forensic Laboratory (the "**State Police Lab**") for testing. Cpl. Hunt arrested Petitioner on September 2, 2013.

A Calhoun County grand jury indicted Petitioner on May 6, 2014. The indictment charged Petitioner with eight counts, each, of (a) incest, (b) sexual assault in the third degree, and (c) sexual abuse by a parent, guardian, custodian or person in a position of trust to a child for a total of twenty-four counts. Petitioner appeared for arraignment on May 19, 2014, and requested discovery.[3] Petitioner (by counsel) advised that he wished to be tried in the same term, so a pretrial hearing was set for June 30, 2014. Trial was set for July 15, 2014.

On June 30, 2014, the State moved to continue the trial because the State had yet to receive the police report. Petitioner objected, and the circuit court denied the State's motion to continue, observing that "[t]he State [wa]s at risk of having cases dismissed[.]" Trial remained set for July 15, 2014.

Three days later, on July 3, 2014, the State provided its first discovery response. This response was supplemented on July 7, 2014, and again on July 9, 2014. The latter supplement included a report from the State Police Lab dated June 25, 2014,

---

[2] We note that the daughter arguably described two different blankets.

[3] Petitioner appeared before the Honorable David W. Nibert, who presided over Petitioner's case in the spring and summer of 2014.

which the prosecutor seems to have received by fax on July 8, 2014. According to the report, the State Police Lab found semen and hairs on the blanket. No relevant material was found on the sleeping bag. The report advised that reference specimens should be collected from relevant persons if the State wished to conduct further testing.

The State moved to continue the trial a second time on July 10, 2014. According to the motion, neither Cpl. Hunt nor CPS Worker Loretta Smith, who had interviewed the victim, was available for trial on July 15, 2014. The trooper was scheduled to be on vacation then. The CPS worker had already left the state on her scheduled vacation and would not be home in time to appear.

On July 12, 2014, Petitioner moved to suppress the State's evidence and dismiss the case with prejudice. Petitioner argued that the State's discovery responses were untimely and that he was "substantially prejudiced" by them.

Instead of trying the case on July 15, 2014, the court heard the parties' motions. The court denied Petitioner's motion to dismiss and granted the State's motion to continue, finding that the State had shown good cause. Trial was rescheduled for September 30, 2014.

On July 15, 2014, the State filed a petition to obtain a DNA sample from Petitioner. The circuit court heard argument on the State's petition two days later and granted the petition over Petitioner's objection. DNA samples were collected from both Petitioner and his daughter, and on September 17, 2014, the State produced a second report

3

from the State Police Lab. This report advised that the blanket recovered from Petitioner's home contained sperm DNA from Petitioner and DNA from the daughter.

The September 30, 2014 trial was continued several times, and on July 29, 2016, Petitioner moved in limine to exclude the State's DNA evidence. Petitioner claimed that the State's DNA analysis was unreliable and could not establish when, where, or how the DNA came to be on the blanket. Accordingly, Petitioner asserted that the probative value of the State's DNA evidence was substantially outweighed by the danger of unfairly prejudicing Petitioner, confusing the issues, and misleading the jury.[4]

Petitioner's case was eventually set for trial on March 14, 2017, but the circuit court was unable to proceed for lack of jurors. Accordingly, the court heard testimony on Petitioner's motion in limine to exclude the State's DNA evidence.[5] Petitioner called Cpl. Hunt to testify about the search for and seizure of the blanket. Petitioner then called his own expert to testify (a) that DNA analysis could not say when or how the DNA was deposited and (b) that the DNA on the blanket could have come from other objects in the laundry room. After hearing Petitioner's evidence, however, the circuit court did not rule on his motion.

---

[4] *See* W. Va. R. Evid. 403 (2014) ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").

[5] This hearing was before the Honorable R. Craig Tatterson, who presided over the remainder of the case.

The court withheld its ruling until November 28, 2017, on the morning of the first day of Petitioner's first trial.[6] At that point, the circuit court denied the motion to exclude the State's DNA evidence, stating that "the jury can look at that and put whatever weight the jury deems appropriate on that evidence." As a result, the jury heard testimony regarding the blanket and the State's DNA analysis at both trials. Jurors also heard testimony from Petitioner's expert witness.

When the State rested during Petitioner's first trial, Petitioner moved for acquittal on all counts. The State agreed that there was no evidence on 15 of the 24 counts, so those counts were dismissed, and the case was submitted to the jury on the remaining nine counts.[7] After several hours of deliberation, the jury advised by note that it could not reach a unanimous decision. In response, the court called the jury back to the courtroom and exhorted jurors to keep an open mind and to attempt to reach a unanimous verdict, if possible, without sacrificing their individual convictions.[8] Then the court instructed the jury to try again for another half hour.

---

[6] Petitioner's case was continued numerous times between July 2014 and November 2017. Petitioner only objects, however, to the first continuance in July 2014.

[7] The remaining nine counts charged Petitioner with committing each of the three crimes on three separate occasions.

[8] The court referred to this instruction as an "*Allen*" instruction. *See State v. Waldron*, 218 W. Va. 450, 459 n.11, 624 S.E.2d 887, 896 n.11 (2005) ("The *Allen* charge, often called the 'dynamite charge,' is a supplemental instruction given to encourage deadlocked juries to reach agreement." Franklin D. Cleckley, *Handbook on West Virginia Criminal Procedure,* Vol. II, page 257 (2nd Ed.1993). The name for this particular

5

An hour later, the jury submitted a note requesting "a better explanation" of the instruction that they were to acquit if the evidence permitted opposing conclusions of both guilt and innocence. The court replied with a handwritten note—approved by both counsel—stating, "If the jury feels two conclusions (guilty and not guilty) are possible based on all the evidence, the jury should adopt the conclusion of innocence."

The jury resumed deliberations and minutes later reached a verdict of not guilty on all remaining counts. After the verdict was read, the following colloquy occurred:

> THE COURT: . . . .
>
> So says each member of the jury, is that your verdict?
>
> (Affirmative responses.)
>
> THE COURT: Is there a request to poll the jury?
>
> [THE PROSECUTOR]: Yes, Judge.
>
> . . . .
>
> THE COURT: You heard the verdict which your foreman signed and which the clerk read. When your name is called, you will answer and signify whether the verdict was then and is now your own true verdict.
>
> THE CLERK: Marisha Collins, is that your verdict?
>
> JUROR: I guess it has to be by the law.
>
> THE COURT: Go through the list.

---

instruction originated from the case of *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)."); *see also* Syl. Pt., *State v. Blessing*, 175 W. Va. 132, 331 S.E.2d 863 (1985) (charge urging a verdict).

. . . .

[THE CLERK/THE COURT]: [Juror], is that your verdict?

[TEN JURORS]: Yes

THE CLERK: Ryan Slider, is that your verdict?

JUROR: By law, I guess.

THE COURT: Ms. Collins, you expressed some hesitation as to whether or not that was your verdict. There were several questions[9] back to me to further explain the law. After you heard my—what I'm going to say are written explanations as to the law, was—is that your verdict?

JUROR: If it has to be.

THE COURT: It doesn't have to be.

JUROR: Then no.

THE COURT: Okay. Mr. Slider, if I were to ask you the same question I had just asked Ms. Collins, you—there were several questions made during the course of deliberations. I submitted handwritten answers. Is your verdict a verdict of not guilty on all charges?

JUROR: No, Sir.

(Footnote added.)

After hearing this, the court sent the jury out to determine whether there was any point in allowing more time to deliberate on their verdict. After a brief recess, the jury advised the court that their minds were made up; they were deadlocked. The court asked

---

[9] From the record, there was only *one* question that asked the court to clarify the law, which is the one noted above.

7

counsel, "Is there a motion? Or do you want the Court to make a finding on its own?" Petitioner's attorney moved for a mistrial, which was granted.

Petitioner's second trial began on August 14, 2018. He was tried on nine counts, in accordance with the evidence submitted at the first trial and the court's "judgment of acquittal on the other [15] counts." During voir dire, a juror indicated that she knew the victim and the two CPS workers and that she had a business or social relationship with the prosecutor. She maintained, however, that these relationships would not affect her ability to be fair.

Subsequently, the court conducted an individual voir dire of the same juror. At that time, the juror said that she knew the victim from Civil Air Patrol. The juror was deputy commander for cadets, and the victim had been a cadet. The juror thought that she had known the victim since 2014, but they "really [had not] had contact in the past couple of years." As for CPS Worker Smith, the juror said that she knew her "around town[,]" but they did not spend time together.[10] Finally, the juror knew the prosecutor because the juror had taught developmental guidance at the prosecutor's school when the prosecutor was in fifth grade. The juror had also participated in 4-H activities (such as camp) with the prosecutor and her parents. The juror guessed that she knew the prosecutor "pretty well," but she thought that she could fairly assess the evidence. Petitioner's attorney moved to

---

[10] No one asked the juror during individual voir dire about her connection to the other CPS worker.

8

strike the juror for cause, but the court refused to do so, citing the juror's "body language and how she answered."

Petitioner did not use a peremptory strike to remove this juror, and she remained a member of the panel of jurors that convicted Petitioner on all nine counts. Petitioner subsequently moved for a new trial, and the circuit court denied Petitioner's motion, later imposing an aggregate sentence of sixteen to forty years. Petitioner appeals from the circuit court's November 30, 2018 amended sentencing order.

## II.  STANDARD OF REVIEW

Petitioner assigns five errors to the proceedings below. First, Petitioner contends that he was acquitted at his first trial and that the circuit court manufactured a hung jury—and thus a mistrial—by polling the jurors in an improper manner. Yet, as Petitioner concedes, his counsel failed to object when the circuit court was polling the jury. Counsel's failure to object forecloses appellate review of this issue, unless the circuit court's alleged error was plain error.[11]  *State v. Miller*, 194 W. Va. 3, 17, 459 S.E.2d 114,

---

[11] The State contends, without support, that Petitioner waived his right to object when he moved for a mistrial. We disagree. It is true that "[w]hen a right is waived, it is not reviewable even for plain error" and, further, that "[o]nly a forfeiture is reviewable under plain error." *State v. Crabtree*, 198 W. Va. 620, 631, 482 S.E.2d 605, 616 (1996). Yet waiver requires an "intentional relinquishment or abandonment of a known right[,]" and nothing in the record suggests that Petitioner *intentionally* relinquished or abandoned his right to object to the circuit court's allegedly improper remarks when it polled the jury. Syl. Pt. 6, in part, *Crabtree*, 198 W. Va. at 623, 482 S.E.2d at 608. Indeed, Petitioner advised the circuit court, before the second trial, that he "felt railroaded" by the court's failure to question the two jurors about "which way they voted." He claimed that he "wanted that contested at that time because it was on the record. But [he] was told

128 (1995). Plain error is error that is plain, that affects substantial rights, and that seriously affects the fairness, integrity, or public reputation of the judicial proceedings. Syl. Pt. 7, *Miller*, 194 W. Va. 3, 459 S.E.2d 114.

Petitioner also contends (a) that his first trial was wrongly continued over his objection, (b) that both trials were tainted by irrelevant, non-probative, and prejudicial evidence, and (c) that his second trial was tainted by a biased juror. When we review circuit court rulings on motions to continue, on evidentiary matters, or on whether to excuse jurors for bias or prejudice, we review the circuit court's rulings for abuse of discretion. Syl. Pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979) (motion to continue); Syl. Pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998) (evidentiary rulings); and *O'Dell v. Miller*, 211 W. Va. 285, 288, 565 S.E.2d 407, 410 (2002) (juror bias or prejudice).

Finally, Petitioner asserts that two or more errors accumulated to his prejudice. When a petitioner alleges cumulative error, we inquire whether "the record . . . shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, . . . even though any one of such errors standing alone would be harmless error." Syl. Pt. 5, in part, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972). However, we apply this doctrine "'sparingly' and only where the errors are apparent from the record." *State v. Peterson*, 239 W. Va. 21, 35, 799 S.E.2d 98, 112 (2017) (quoting *Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 118, 459

---

[presumably by counsel], no, we couldn't do that unless we lose and we appeal." On these facts, we find that Petitioner's right to object was forfeit, not waived, which makes review for plain error appropriate on appeal.

10

S.E.2d 374, 395 (1995)).  With these standards of review in mind, we will consider Petitioner's assignments of error.

## III.  ANALYSIS

As noted above, Petitioner raises five assignments of error.  We will address each one in turn.

### A.  First Trial—Acquittal

Petitioner argues that his conviction should be reversed because his first trial resulted in an acquittal.  According to Petitioner, the circuit court thwarted his acquittal by polling the jury in an improper manner.

The West Virginia Rules of Criminal Procedure require a circuit court to poll the jury whenever a party requests it or the court deems it appropriate.  W. Va. R. Crim. P. 31(d) (1995).  We have this rule to ensure that the verdict is unanimous, as required by the Sixth Amendment to the United States Constitution and our Rules of Criminal Procedure.  *Ramos v. Louisiana*, ___ U.S. ___, ___, 140 S. Ct. 1390, 1397, ___ L. Ed. ___, ___ (2020); W. Va. R. Crim. P. 31(a).  As we have said, "the chief purpose behind an individual poll of jurors is to enable a juror to express any reservation he may have about the verdict free from the pressure of his fellow jurors."  *State v. Tennant*, 173 W. Va. 627, 630, 319 S.E.2d 395, 399 (1984).

During polling, however, it is not always clear whether a juror agrees (or disagrees) with the verdict.  Sometimes a juror's candid response to, "Is that your verdict?" creates ambiguity.  Accordingly, we have held "that appropriate neutral questions may be

11

asked of the juror to clarify any apparent confusion, provided the questions are not coercive." Syl. Pt. 2, in part, *Tennant*, 173 W. Va. 627, 319 S.E.2d 395. Such questions are appropriate "when a juror indicates in a poll that he either disagrees with the verdict or expresses reservations about it[.]" *Id*. *Tennant* authorizes, however, "only a very limited inquiry" in order "to prevent the possibility of coercing the juror to conform to the verdict." *Id*. at 630, 319 S.E.2d at 399. If, after limited, neutral, and non-coercive questioning, the juror continues to disagree with, or have reservations about, the verdict, "the trial court must either direct the jury to retire for further deliberations or discharge the jury." *Id*. at 628, 319 S.E.2d at 396, syl. pt. 2, in part.[12]

In Petitioner's case, the State asked the circuit court to poll the jury, and ten out of twelve jurors answered "Yes" to the finding of not guilty without qualification or any apparent hesitation. Yet two jurors offered qualified responses—"I guess it has to be by the law" and "By law, I guess"—that evidently suggested to the circuit court that these jurors may have disagreed with the verdict or had reservations about it. Petitioner argues that these responses were not sufficiently equivocal to prompt further inquiry, and he refers us to a case in which the District of Columbia Court of Appeals held that a "juror's response

---

[12] *See also State v. Cole*, 180 W. Va. 412, 419, 376 S.E.2d 618, 625 (1988) ("Juror No. 5 expressed some initial doubt as to the verdict. As permitted by *Tennant,* the court questioned the juror in an attempt to clarify any possible confusion. The juror's answers to those questions did not dispel the existence of doubt. To the contrary, Juror No. 5 expressed reservations about the guilty verdict on three occasions. Once it became apparent that the verdict was not unanimous, the court was duty bound to either direct the jury to deliberate further or to declare a mistrial.").

[("Guilty, I guess")], in context, [did] not demonstrate uncertainty about appellant's guilt[.]" *Johnson v. United States*, 470 A.2d 756, 759 (D.C. App. 1983).

Yet Petitioner ignores *Johnson's* reason for reaching this conclusion: "The trial court is in a much better position to evaluate these factors than . . . an appellate tribunal." *Id*. at 760. As the *Johnson* court observed, "Guilty, I guess" can be understood several different ways,[13] and "[t]o determine which of these meanings should be ascribed . . . , one must consider the juror's demeanor and the tone and pattern of his speech." *Id*. Because of this, "the trial judge possesses 'a measure of discretion' in evaluating such responses, and 'the reasonable exercise of this discretion should be accorded proper deference by a reviewing court.'" *Id*. (quoting *United States v. Brooks*, 420 F.2d 1350, 1353 (D.C. Cir. 1969)). In *Johnson*, the fact that the trial court allowed the jury poll to continue, and the fact that defense counsel failed to object, showed that the juror's response of "Guilty, I guess" was unequivocal and that the trial court judge acted reasonably in interpreting the response that way. *Johnson*, 470 A.2d at 760.

To return to Petitioner's case, we were not present to hear or observe the jurors' responses, and Petitioner, himself, argues that their responses were susceptible to

---

[13] While "'Guilty, I guess' could indicate that the juror was uncertain about the defendant's guilt, it also could mean that the juror was uncertain whether it was his turn to speak, or unclear about the terminology that he should use." *Johnson*, 470 A.2d at 760. "I guess" can also function "as a meaningless addendum to an answer, without intending to communicate uncertainty of any kind." *Id*.

more than one interpretation.[14]  Therefore, we are ill-equipped to second-guess the circuit court's determination that these responses warranted clarification.  Furthermore, we agree with the *Johnson* court and now hold that, when a circuit court polls a jury pursuant to Rule 31(d) of the West Virginia Rules of Criminal Procedure, it is within the circuit court's sound discretion to evaluate the jurors' responses and determine whether clarifying questions should be asked of the jurors.[15]

Petitioner also finds fault with the circuit court's statement—"It doesn't have to be"—contending that it "amounted to abetting jury nullification" and was "wholly improper[.]"  We note that, in *Tennant*, we authorized a circuit court to ask "appropriate neutral *questions* . . . to clarify any apparent confusion, provided the *questions* are not coercive."  Syl. Pt. 2, in part, *Tennant*, 173 W. Va. 627, 319 S.E.2d 395 (emphasis added).  This language from *Tennant* might be taken to suggest that, in seeking to "clarify any

---

[14] In one sentence in his brief, Petitioner suggests that "the words 'I guess' are essentially meaningless surplusage to the jurors' implicit acknowledgment that they had reached a not guilty verdict by applying the law."  In the next sentence, Petitioner writes, "*Another way of construing the jurors' statements* is that they were simply unenthusiastic about the verdict the law required them to arrive upon."  (Emphasis added.) Petitioner ignores a third possible interpretation—among, perhaps, many others—that the two jurors were prepared to convict Petitioner but felt constrained to acquit him by some aspect of the circuit court's instructions that they were not certain they had understood.

[15] We also believe that there is an important difference between (a) saying that a juror's response *required* a trial court to inquire further and (b) saying that a juror's response *barred* a trial court from inquiring further.  Both sides in a criminal case have a right to know that the jury's verdict is unanimous, and—within reason—a trial court should err on the side of certainty.  Because of this, there are circumstances where a trial court has *discretion* to inquire further even though it has no *duty* to do so.

apparent confusion," a circuit court must confine itself to asking questions. We reject that understanding of *Tennant*.

As *Tennant* explains, "the chief purpose behind an individual poll of jurors is to enable a juror to express any reservation he may have about the verdict free from the pressure of his fellow jurors." *Id*. at 630, 319 S.E.2d at 399. To advance this purpose, we allow circuit courts to pose "appropriate neutral questions . . . to *clarify any apparent confusion*[.]" *Id*. at 628, 319 S.E.2d at 396, syl. pt. 2, in part (emphasis added). If a circuit court's appropriate, neutral questions reveal, for example, that a juror is confused about a matter or feels coerced to join the majority's verdict, we fail to see how a circuit court can correct the juror's confusion, or assure the juror of his or her freedom to decide, without making appropriate, neutral statements in response. We hold, therefore, that when a circuit court polls a jury pursuant to Rule 31(d) of the West Virginia Rules of Criminal Procedure, and appropriate, neutral questions reveal that a juror is confused about a matter, feels coerced to join the majority's verdict, or is otherwise in need of further instruction, the circuit court may respond in a very limited manner with appropriate, non-coercive, neutral statements that address the concern. *Accord State v. Vandevender*, 190 W. Va. 232, 235, 438 S.E.2d 24, 27 (1993) (*per curiam*) ("[T]he trial court did not err in polling the jury and explaining to the jurors the necessity in arriving at a unanimous verdict. We find that the comments and questions posed by the court to the jury were neutral and were not coercive.").

15

In this case, the circuit court asked a juror if her verdict was to acquit Petitioner. When she replied, "If it has to be[,]" the circuit court responded, "It doesn't have to be[,]" and the juror answered, "Then no." This exchange, and the circuit court's statement in particular, is subject to interpretation. According to Petitioner, the circuit court's statement "explicitly invited [the jurors] to change their verdicts[.]" The State, by contrast, argues that this statement assured the juror that she need not go along with the majority. Either way, there was nothing *coercive* about the circuit court's statement. On the contrary, the circuit court's statement seems to have freed the juror to express a verdict that accorded with her views pursuant to the law as instructed by the circuit court.

Accordingly, the circuit court's statement was neutral and appropriate.[16] Therefore, we refuse to reverse his conviction based on the circuit court's manner of polling the jury.

---

[16] In this case, Petitioner's counsel did not object to the circuit court's statement. By failing to object, counsel deprived the circuit court (and this appellate court) of whatever clarifications, if any, might have flowed from his objection. We need not decide, however, whether the circuit court abused its discretion when it sought to clarify the jurors' responses or whether the circuit court acted inappropriately when it said that the juror's verdict did not "have to be" to acquit. Because Petitioner failed to preserve these issues for appeal, it is enough for us to determine whether—if the circuit court *did* err in these matters—the circuit court's error was *plain*. Plain error is error that is "plain or obvious[,]" *State v. LaRock*, 196 W. Va. 294, 316, 470 S.E.2d 613, 635 (1996), and "may be plain under existing law" or "become[] plain on appeal because the applicable law has been clarified[,]" Syl. Pt. 6, in part, *State v. Myers*, 204 W. Va. 449, 513 S.E.2d 676 (1998). Based on our review of the record, we find that the circuit court did not commit plain or obvious error.

## B. First Trial—Continuance

Petitioner argues next that the circuit court erred when it continued his first trial past the first term of court,[17] over his objection. According to Petitioner, "the sole basis for the continuance was to spare the State the rightful consequences of its dilatory discovery and failure to prepare." Petitioner's characterization captures the State's predicament in June and July 2014. The State had failed to provide discovery in a timely manner,[18] and it had failed to secure two of its witnesses (Cpl. Hunt and CPS Worker Smith) for trial.

The West Virginia Code provides that, "[w]hen an indictment is found in any county, against a person for a felony or misdemeanor, the accused . . . shall, unless good cause be shown for a continuance, be tried at the same term." W. Va. Code § 62-3-1 (1981). The circuit court found that the State showed "good cause" to continue Petitioner's trial based on unavailable witnesses. On the facts of this case, we find that "good cause" did exist for Petitioner's case to be continued to the following term.

---

[17] Petitioner was indicted on May 6, 2014, which was the first day of the May term. W. Va. T. C. R. 2.05. The next term began on the first Tuesday in September. *Id.* When the circuit court granted the State's motion to continue, it continued Petitioner's trial to September 30, 2014.

[18] *See* W. Va. T. C. R. 32.03 ("At every arraignment . . . [,] the defendant shall notify the court and the attorney for the State . . . whether discovery by the defendant is requested. If discovery is requested, within fourteen (14) days the attorney[s] . . . shall confer in order to comply with W.Va. R. Crim. P. 16 [(disclosure of evidence)], and make available to the opposing party the items in their custody or control or which by due diligence may become known to them.").

17

As of June 30, 2014, when the State first moved to continue the trial, the State had yet to receive the police report, and the State's first expert report from the State Police Lab had only just been issued on June 25, 2014.[19]  When this motion to continue was denied, the State provided its first discovery response days later, and it supplemented this response twice in the coming days.  This Court has previously held that a continuance is not improper where, "there is nothing to indicate that the State intentionally or oppressively sought to delay the trial[,] nor is there a showing that the delay [of the trial] caused any substantial prejudice to the petitioner." *State v. McCartney*, 228 W. Va. 315, 324, 719 S.E.2d 785, 794 (2011).  Likewise, we do not believe that the State acted "intentionally or oppressively" in this case or that Petitioner was caused any substantial prejudice as a result of the delay.

Moreover, because the State's delay in providing the requested discovery was not intentional or oppressive, the circuit court correctly determined that a continuance was the proper remedy to address such delay.  "Our cases and the West Virginia Rules of Evidence have declared an implicit preference for a continuance when there has been a discovery violation[,]" and we have held that Petitioner's preferred remedy of "dismissal should be used sparingly and only when the prosecution has been derelict in its effort to comply with discovery orders." *State ex rel. Rusen v. Hill*, 193 W. Va. 133, 141, 454 S.E.2d 427, 435 (1994).  In this case, the State's discovery response was late but not

---

[19] As noted above, the record suggests that the prosecutor did not receive this report until July 8, 2014.  The prosecutor supplemented discovery the next day.

18

"derelict." Under the circumstances, continuing Petitioner's case caused no "great . . . disruption in the trial process" and, by affording Petitioner additional time to prepare for trial, fully dissipated any arguable prejudice caused by the State's untimely disclosure.[20] *Id.* Accordingly, we find no error in the circuit court's decision to continue Petitioner's trial, and we refuse to reverse his conviction based on the circuit court's reasonable exercise of discretion.

### C. First and Second Trials—Improper Evidence

Petitioner also challenges the circuit court's decision to admit the State's DNA evidence, which was extracted from a blanket found in Petitioner's laundry room. According to Petitioner, the State's DNA evidence was "wholly irrelevant, non-probative, and prejudicial" because "there was no way to distinguish between DNA that could have had a nexus to the alleged crimes, and DNA that was wholly explainable as a natural result of the Petitioner having contact with his own articles in his own home." Petitioner alleges that the circuit court made "no findings that the DNA evidence was relevant, nor that it was substantially more probative than prejudicial under Rules 401 and 403 of the Rules of Evidence."

Rule 401 of the West Virginia Rules of Evidence provides that "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be

---

[20] We also note that the circuit court released Petitioner from pre-trial incarceration on the intended date of trial.

without the evidence[.]" W. Va. R. Evid. 401(a).[21] The DNA evidence in question showed that the blanket recovered from Petitioner's home contained sperm DNA from Petitioner and also contained DNA from his daughter. Petitioner cannot seriously contend that this evidence did not *tend* to make the fact that Petitioner had sexual intercourse with his daughter "more or less *probable* than it would [have] be[en] without the evidence[.]" W. Va. R. Evid. 401(a) (emphasis added). "The relevant inquiry is whether a reasonable person, with some experience in the everyday world, would believe that the evidence *might be helpful* in determining the falsity or truth of any fact of consequence." *State v. Derr*, 192 W. Va. 165, 178, 451 S.E.2d 731, 744 (1994) (emphasis added). Plainly, the State's DNA evidence met this minimal threshold of relevance under Rule 401.

Rule 403 authorizes a circuit court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." W. Va. R. Evid. 403. Petitioner's objections to the State's DNA evidence had nothing to do with "unfair prejudice, confusing the issues, misleading the

---

[21] The circuit court made no *express* finding, but it did have this to say when it granted the State's motion to secure a DNA sample from Petitioner:

> At this point, I am probably not in a real good position to analyze the probative value of the evidence, either way it turns out. Obviously, if it's not Mr. [S.'s], it might be deemed to be exculpatory evidence. It may not have a high degree of probative value, I don't know. But this is something the State has the burden of going forward here, and if the State wants to go this route, I think the State is entitled to secure samples and swabs.

20

jury," or any other outcome of concern under Rule 403. "The mission of Rule 403 is to eliminate the obvious instance in which a jury will convict because its passions are aroused rather than motivated by the persuasive force of the probative evidence." *State v. Guthrie*, 194 W. Va. 657, 682–83, 461 S.E.2d 163, 188–89 (1995). Petitioner's arguments addressed the *weight* of the State's DNA evidence, not its "pronounced tendency . . . to lead the jury . . . to convict a defendant for reasons other than the defendant's guilt." *Id*. at 683, 461 S.E.2d at 189. Accordingly, and despite Petitioner's insistence otherwise, Rule 403 had no bearing on whether the State's DNA evidence was admissible, and the circuit court's express reason for denying Petitioner's motion—that the weight of the State's DNA evidence was for the jury to decide[22]—was correct and went to the heart of the matter.

In the end, we agree with the State that the defect that Petitioner ascribes to the State's DNA evidence—that it did not necessarily exclude his innocence—is true of many forms of circumstantial evidence. Yet for nearly twenty-five years, we have rejected a rule that "circumstantial evidence will not support a guilty verdict unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence[.]" *Id*. at 668, 461 S.E.2d at 174 (quoting and overruling *State v. Noe*, 160 W.Va. 10, 15, 230 S.E.2d 826, 829–30 (1976)) (alteration removed). Instead, we have recognized that

> [c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some case[s] point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both

---

[22] In denying Petitioner's motion to exclude the State's DNA evidence, the circuit court stated, "That evidence—the jury can look at that and put whatever weight the jury deems appropriate on that evidence."

21

instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Guthrie*, 194 W. Va. at 668, 461 S.E.2d at 174 (quoting *Holland v. United States*, 348 U.S. 121, 140, 75 S. Ct. 127, 137–38, 99 L. Ed. 150, 166 (1954)) (alteration to conform quotation to original). For these reasons, we find no error in the circuit court's decision to allow the jury to hear the State's DNA evidence, and we refuse to reverse Petitioner's conviction based on the circuit court's reasonable exercise of discretion in this matter.

## D. Second Trial—Biased Juror

Petitioner finds additional fault with the circuit court's decision, at his second trial, to seat a juror who admitted to knowing the victim and the prosecutor.[23] According to Petitioner, "it was an abuse of the Circuit Court's discretion to leave on [the jury] a juror who had so many indicia of connections to the case," especially a juror who formerly held a position of "heightened trust" with respect to the victim and the prosecutor.

Petitioner was entitled to a fair trial, and "[a] fair trial . . . requires a fair and impartial jury." *State v. Peacher*, 167 W. Va. 540, 552, 280 S.E.2d 559, 569 (1981). "[A] trial court must grant a challenge for cause [and remove a juror] if [the] prospective juror's

---

[23] Petitioner's brief focuses on the juror's connections with the victim and the prosecutor, but Petitioner also mentions the juror's "relationship with" CPS Worker Smith, whom the juror knew "around town." We find this relationship even more attenuated than the juror's relationships with the prosecutor and the victim. To the extent, if any, Petitioner contends that knowing the CPS worker "around town" was a predicate for excluding the juror, we reject this contention.

actual prejudice or bias is shown" during voir dire. *State v. Miller*, 197 W. Va. 588, 605, 476 S.E.2d 535, 552 (1996). "Actual bias can be shown either by a juror's own admission of bias or by proof of specific facts which show the juror has such prejudice or connection with the parties at trial that bias is presumed." Syl. Pt. 5, *Miller*, 197 W. Va. at 593, 476 S.E.2d at 540. "Once a prospective juror has made a clear statement during *voir dire* reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair." Syl. Pt. 5, *O'Dell v. Miller*, 211 W. Va. 285, 565 S.E.2d 407 (2002).

Yet, in Petitioner's case, the juror neither confessed bias nor admitted to facts that showed she was presumptively biased. The juror said that she knew the victim from Civil Air Patrol, where the juror was deputy commander and the victim had been a cadet, but the juror had not been in contact with the victim for a "couple of years." The juror's connection to the prosecutor was even more remote. The juror knew the prosecutor because the juror taught at the same school the prosecutor attended *when the prosecutor was in fifth grade* and because the juror shared some social activities with the prosecutor and her parents *when the prosecutor was in 4-H*. It is clear that these activities, and the prosecutor's fifth-grade year, happened many years ago. Admittedly, the juror thought that she knew the prosecutor "pretty well," but she also thought that she could fairly assess the evidence, and the circuit court believed her, citing the juror's "body language and how she answered."

23

The circuit court's credibility determination carries substantial weight with us. *Miller*, 197 W. Va. at 606, 476 S.E.2d at 553. We have said that "the challenging party bears the burden of persuading the *trial court* that the juror is partial and subject to being excused for cause." *Id*. Only "a clear and definite impression that a prospective juror would have been unable faithfully and impartially to apply the law" will lead us to intervene on appeal. *Id*. As we said in *Miller*, Petitioner has met "neither the burden of production nor the burden of persuasion[,]" and we decline to intervene in this matter.[24] *Id*. Accordingly, we find no error in the circuit court's refusal to dismiss the challenged juror, and we refuse to reverse Petitioner's conviction based on the circuit court's reasonable exercise of discretion in this matter.

### E. Cumulative Error

Finally, Petitioner contends that the circuit court's several alleged errors accumulated to his prejudice. We have held that, "[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error." Syl. Pt. 5, *State v. Smith*,

---

[24] We also reject Petitioner's argument that—by way of analogy to the facts in *O'Dell*, 211 W. Va. 285, 565 S.E.2d 407—the juror formerly occupied a position of trust with respect to the victim and the prosecutor that made it inappropriate for the juror to hear Petitioner's case. Petitioner misunderstands the relevant dynamic. In *O'Dell*, the *defendant* and the *defendant's attorney* occupied the position of trust with respect to the juror. *Id*. at 287, 565 S.E.2d at 409. In Petitioner's case, the *juror* occupied the position of trust, to the extent such trust may have existed, with respect to the victim and the prosecutor.

156 W. Va. 385, 193 S.E.2d 550 (1972). The threshold standard is "numerous errors committed during" a single trial. *Id*. Petitioner had two trials and has yet to show that the circuit court committed a single error in either trial, whether harmless or otherwise. Accordingly, Petitioner has no basis for relief, and we refuse to reverse his conviction on the alleged ground of cumulative error.

## IV. CONCLUSION

For all of the foregoing reasons, we affirm Petitioner's conviction and the circuit court's November 30, 2018 amended sentencing order.

Affirmed.